OPINION
Plaintiff-appellant Richard Lebold appeals the August 4, 1999 Judgment Entry of the Tuscarawas County Court of Common Pleas which dismissed appellant's complaint. Defendant-appellee is the State of Ohio Department of Taxation.
 STATEMENT OF THE CASE AND FACTS
Appellant filed a quiet title complaint on June 18, 1996. Appellant had been involved in various business ventures, both personally and corporately, and incurred sales tax liabilities which he never paid. As a result, appellee caused various sales tax liens to be filed against appellant. These tax liens included at least two taxpayer identification numbers (hereinafter "TIN"). TIN 79-028624 related to taxes incurred from appellant's business Richard Lebold dba Lebold Funeral Home. Because this business was a sole proprietorship, appellant was individually liable for all tax liability. Appellant had also been involved with another business, The Zoar Hotel. The TIN for the Zoar Hotel was 79-06202. Apparently, the Zoar Hotel was a corporation and appellant was an officer of the corporation. As an officer, appellant became personally liable for unpaid sales taxes of the Zoar Hotel. Appellant received a number of collection letters from Douglas J. O'Meara, an Assistant Attorney General for the State of Ohio. Mr. O'Meara was attempting to collect past due sales tax under TIN 79-08624 (the funeral home). Appellant retained counsel in an effort to pay his outstanding tax liabilities. To that end, appellant, through his counsel, entered into negotiations with Mr. O'Meara to settle his sales tax liabilities. The parties arrived at a compromise agreement whereby appellant would pay a reduced amount for the release of his sales tax liens. The crux of the dispute is whether the agreement applied to all of appellant's sales tax liabilities, i.e, those for the funeral home and for the Zoar Hotel, or just those associated with the funeral home. The correspondence between appellant's counsel and Mr. O'Meara illuminates the final agreement. On March 30, 1994, appellant's counsel wrote to Mr. O'Meara stating: I represent Dick Lebold in regards to the sales tax obligation to the State of Ohio.
 * * *
I need from you and/or the State of Ohio a complete breakdown as to the tax liability for each period involved and the payments credited to each specific assessment. He has been paying you the sum of $200 a month for a period, you recovered approximately $4,500 in the sale of two pieces of real estate, and you also recovered almost $2,700 when you attached the bank account.
We need some proof as to where these amounts were credited and the correct balances for each assessment.
Mr. O'Meara responded in correspondence dated April 19, 1994: The $21,042.22 is a compromise figure that the State of Ohio is willing to accept. * * *
I am not going to call down there ask them to trace down every payment. * * * If Mr. Lebold wishes to contact the tax office or anyone else to see where these credits were made, he is more than free to do so. * * *
Thereafter, appellant's counsel contacted the office of the Attorney General in Columbus, as suggested by Mr. O'Meara. In an April 22, 1994 correspondence to the Columbus office, appellant's counsel states: You have made various assessments against my client in a filed means in Tuscarawas County, Ohio.
My client is desirous of an accounting as to exactly how much he owes the State of Ohio.
* * * Over the last 12 years, Mr. Lebold has made many payments, has filed returns to reflect the actual amount owing, has had his bank account attached, has had money paid to you as the result of the sale of real estate, and should certainly be entitled to an explanation from the Department of Taxation as to the exact amount owed, the credits made against that amount owed, and a net balance. I would hope this would be in a computer, and a computer printout showing this information would certainly be satisfactory.
[Appellant] wants to pay his obligations to the state, but obviously is entitled to know exactly what those obligations are. I look forward to hearing from you or from the Department of Taxation.
In an April 28, 1994 letter, appellant's counsel informed Mr. O'Meara he had requested a print-out from the Columbus office and intended to continue paying a nominal amount until such time as the State provided the requested accounting. In an August 4, 1994 letter, Mr. O'Meara appears to respond to appellant's letter to the Columbus office: This office is in receipt of your letter requesting a print-out of the tax liability for Mr. Lebold. As you indicated you were contacting the Attorney Generals' office directly we are assuming you do not need those figures from this office. If however, you would desire copies we will copy the latest print-out showing the credits, assessments etc. Please forward the payment of .50 per page (27 pgs) plus postage and handling in the amount of $2.50.
In an August 11, 1994 letter, appellant's counsel, responding to Mr. O'Meara's August 4th letter, requested a copy of the print-out from Mr. O'Meara's office. In a September 1, 1994 letter, appellant's counsel thanked Mr. O'Meara for sending the copy and made one further request: Could you please give me the name of someone down in Columbus who can interpret [the print-outs] for me* * *? I want to get to the point that we are all talking about the same numbers and playing on the same page.
In a September 12, 1994 letter, Mr. O'Meara attempted to explain the computation procedures and to explain in general terms how compromised figures were negotiated. The letter did go on to state: If you want to review the specific forms with me over the phone or when you are in the vicinity some day, I will review them with you. Unfortunately, you will not be able to have anybody in Columbus review this file with you. The reason I sent a complete copy of the entire print-out and have of course submitted complete copies of those print-outs previously to Mr. Lebold, is so you have all the information that I have.
(Emphasis added).
On September 29, 1994, appellant's counsel again wrote to Mr. O'Meara, starting the negotiation for a final settlement of the tax liens: Based on the above scenario, it is our position that Mr. Lebold has, in all likelihood, overpaid his actual tax liabilities. We are aware, however, that because of his lack of record keeping for a significant period of time, the cost of proving his payments and the actual amount owed would probably exceed the benefits to be realized. As a result, at this point in time, we will accept the balance that is shown by your records.
Mr. Lebold still owns a lot in Wilkshire, and there appears to be some interest in it. It is our hope that we will secure a purchaser for that lot, turn over to you the net proceeds in return for you lien releases, and be able to put together some other amount of money for a complete settlement of all claims.
On December 13, 1994, appellant's counsel sent Mr. O'Meara a proposed release and settlement agreement. However, in a December 14, 1994 letter, Mr. O'Meara declined to sign a settlement agreement, stating: We will not submit a release and settlement as submitted by you. A compromise and settlement has to be approved by the Ohio Department of Taxation. I am not able to compromise a Department of Taxation claim. Nonetheless, in all the years that I have been engaging in this process, I have yet to have a lien release turned down with regards to compromise settlement under these circumstances. To say that could never occur, I could not give you an absolute guarantee.
I would anticipate that upon payment of $6,460.76 with a check made payable to the Attorney General of Ohio, that I would be able to submit the same to the Attorney General with a request that it be applied as a compromise figure to pay off these obligations in full. Since I was given this figure by the Attorney General's Office upon inquiry for a lower amount, there should be absolutely no problem with this figure being the pay-off.
Therefore, if he will direct to this office, a check in the amount of $6,460.76 made payable to the Attorney General of Ohio, we will follow the procedures that have been outlined both to you and to him in the past with regards to the pay-off of this matter. I cannot follow any other procedure and will not follow any other procedure.
Thereafter, on December 16, 1994, appellant's counsel sent a cover letter along with a check for $6,460.76 "representing settlement in full of all claims of the State of Ohio, Department of Taxation, for sales tax liability through the tax year 1991." The letter further stated: Although you are not authorized to sign a Release on behalf of the State, it is understood that upon acceptance of this check, the State of Ohio will release and discharge all liens it has filed against [appellant] for Sales Tax liabilities through the Tax Year 1991, and the check is being sent under that condition.
If for some unknown reason, the State will not accept this amount in full satisfaction of those liabilities, the check is to be returned to me immediately.
The check noted appellant was the remitter, but contained no TIN. Further, the back of the check, just above the space for endorsement stated: "Satisfaction of sales tax liens through tax year 1991." The State of Ohio endorsed and negotiated the check. When appellant attempted to sell his real property, he realized the State did not release all of the liens against him. When appellant asked the State to release the liens pursuant to their agreement, the State refused. The State's position was the sales tax liens released as a result of the above referenced negotiation related only to those liens against appellant personally, i.e. the funeral home liability. The remaining liens, resulting from corporate liability, i.e. the Zoar Hotel liability, remained unsatisfied. Appellant filed a quiet title action against the State of Ohio to clear the remaining sales tax liens. The matter proceeded to a bench trial on April 28, 1999. In his case-in-chief, appellant called two witness; Kate Oklok, Mr. O'Meara's supervisor with the Ohio Attorney General's Office, and himself. Ms. Oklok was called on cross-examination. The defense presented no case. Before the testimony began, the attorneys agreed there was a binding agreement between appellant and appellee and that parole evidence establishing the intent of the parties was unnecessary. The parties asked the court to review the agreement to make its determination. The parties stipulated to the admissibility of the above-referenced letters, the print-out, and the check. Ms. Oklok testified Mr. O'Meara had authority only to arrange settlement of the funeral home liability. However, any final agreement would be made by the State of Ohio. Ms. Oklok testified Mr. O'Meara did have access to other tax information relating to appellant, but had only been assigned the funeral home file. She further acknowledged appellant was also personally responsible for liens against a corporation in which he was an officer (the Zoar Hotel). Mr. Oklok explained such corporate liability was joint and several between the corporation itself and the responsible corporate officer. Appellant was the only other witness to testify. Appellant explained before he retained counsel, he met with Mr. O'Meara. At that meeting, Mr. O'Meara attempted to set up a payment plan for all of appellant's sales tax liabilities, including those associated with the Zoar Hotel. After hearing the testimony and accepting exhibits in a bench trial conducted April 28, 1999, the trial court took the issues under advisement and set a briefing schedule for post-trial memoranda. In a July 2, 1999 Judgment Entry, the trial court dismissed appellant's complaint. On the same day, appellant filed a Motion for Findings of Fact and Conclusions of Law. On August 4, 1999, the trial court filed its Findings of Fact and Conclusions of Law. This judgment entry concluded appellant had failed to prove appellee settled all tax liability and found no accord and satisfaction between the parties. It is from that judgment entry appellant prosecutes this appeal, assigning as error the following:
 I. THE TRIAL COURT ERRED IN CONSIDERATION OF DOCUMENTARY EVIDENCE PRELIMINARY TO THE FINAL SETTLEMENT TERMS TO VARY THE FINAL WRITTEN AGREEMENT ON SETTLEMENT ON THE SALES TAX DISPUTE.
 II. THE TRIAL COURT ERRED IN FINDING THAT THERE WAS NO ACCORD AND SATISFACTION OF ALL SALES TAX LIENS AGAINST THE APPELLANT, INCLUDING THE PERSONAL ASSESSMENTS AGAINST HIM RELATED TO THE ZOAR HOTEL CORPORATION.
 III. IF THE TRIAL COURT WAS PERMITTED TO CONSIDER DOCUMENTARY EVIDENCE PRELIMINARY TO THE FINAL SETTLEMENT DOCUMENTS ON THE ISSUE OF INTENT OF THE PARTIES, THEN THE TRIAL COURT ERRED IN NOT TAKING TESTIMONY FROM THE PARTIES INVOLVED IN THE SETTLEMENT NEGOTIATIONS TO ESTABLISH THE TRUE INTENT WHICH WAS CONTRARY TO THE FINAL SETTLEMENT DOCUMENTS.
 II
Because we find it dispositive of this appeal, we first address appellant's second assignment of error. In the second assignment of error, appellant maintains the trial court erred in failing to find the parties entered into an accord and satisfaction requiring the appellee to release all tax liens against appellant. We agree. Accord and satisfaction is a common-law doctrine where there is a contract between a creditor and debtor for settlement of a claim by some performance other than that which is due. AFC Interiors v. DiCello (1989), 46 Ohio St.3d 1, 3. Satisfaction takes place when the creditor accepts the accord. Id. Four elements must be present to have an accord and satisfaction: proper subject matter, competent parties, mutual assent, and consideration. 1 American Jurisprudence 2d 304, Accord and Satisfaction, Section 4. As an accord and satisfaction is the result of an agreement between the parties, it cannot be consummated unless the creditor accepts the lesser amount with the intention that it constitutes a settlement of the claim. State ex rel. Shady Acres Nursing Home, Inc. v. Rhodes (1983), 7 Ohio St.3d 7, 8. We have reviewed the check and accompanying letter. The State of Ohio negotiated the check with no change or limitation to the notation on the back of the check. Further, the language in the cover letter was very clear: [I]t is understood that upon acceptance of this check the State of Ohio will release and discharge all liens it has filed against [appellant] for sales tax liabilities through tax year 1991, and the check is being sent under that condition.
With this information, the State of Ohio chose to negotiate the check.
In its brief, the State has argued Mr. O'Meara had access only to the funeral home account, TIN 79-028624. The State contends any personal liability appellant incurred due to his corporate association with the Zoar Hotel was under the completely separate TIN 79-06202. Because Mr. O'Meara was never assigned the case regarding the Zoar Hotel, he had no authority to negotiate a release of the liens associated with that tax payer number. We find, however, even if Mr. O'Meara was assigned only one of appellant's TINs for collection, he had apparent authority under these facts to negotiate all of appellant's sales tax liability. From the above referenced letters attempting to negotiate a settlement of this matter, appellant's counsel sought first from Mr. O'Meara and then from the State of Ohio a "complete" listing of tax liabilities. It was, in fact, Mr. O'Meara who sent the account information and specified any explanation of that print-out would have to come from Mr. O'Meara. Page two of the print-out Mr. O'Meara sent to appellant's counsel details TIN 79-028624. However on the same line the form states "2 Related TINS: 79-026202." Therefore, we can only conclude Mr. O'Meara was aware of related tax liens. When Mr. O'Meara received the correspondence which conditioned acceptance of the check on complete release of "all liens", we find Mr. O'Meara was aware of other, related liens filed under a different TIN. By negotiating the check, the State of Ohio agreed to the terms as set forth in the cover letter and on the back of the check. Accordingly, we find the trial court erred in failing to find an accord and satisfaction. Appellant's second assignment of error is sustained.
 I, III
In light of our disposition of appellant's second assignment of error, appellant's first and third assignments of error are moot. The August 4, 1999 Judgment Entry of Tuscarawas County Court of Common Pleas is reversed and remanded to that court for further proceedings consistent with law and this opinion.
GWIN, P.J. and WISE, J. CONCUR.